UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| MARLA MONTELL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 12-36-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DIVERSIFIED CLINICAL SERVICES | ) | **MEMORANDUM OPINION** |
| INC., et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is pending for consideration of Defendants Diversified Clinical Services, Inc.'s ("DCS"), and Austin Day's Motion for Summary Judgment and Motion for Sanctions. [Record Nos. 36, 43]  The defendants contend that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.  [Record No. 36]  Additionally, they seek sanctions against Plaintiff Marla Montell and her counsel for filing and maintaining the Complaint which they assert is frivolous. [Record No. 43]  For the reasons discussed below, the Court will grant the defendants' motion for summary judgment but deny their motion for sanctions.

**I.**

This retaliation case arises out of Plaintiff Marla Montell's employment with DCS which began November 30, 2009, and ended May 23, 2011.  Montell alleges that she was sexually harassed by her supervisor Austin Day throughout her employment and that, following her report

of Day's conduct to the DCS Human Resource ("HR") department, she was retaliated against and constructively discharged. The defendants deny these allegations and contend that Montell willfully resigned from her position.

DCS operates comprehensive outpatient wound care treatment centers for numerous hospitals throughout the United States. It contracts with medical facilities, such as the Frankfort Regional Medical Center ("FRMC"), to manage the operations of outpatient clinics. DCS provides a variety of treatment options to patients such as hyperbaric oxygen ("HBO") therapy. The company derives its income primarily from HBO therapy treatments and from patient visits, also known as "wound care revenue." In 2009, DCS began operating FRMC's wound care center. Montell served as the Program Director for the wound care center at FRMC. A Program Director employed by DCS is located at each of DCS's facilities to manage the facility operations. Each is responsible for managing the day-to-day operations of the center and for the growth of the center by encouraging new patients and doctors to use the facility.

At times relevant to this matter, Day was employed by DCS as an Area Vice President ("AVP"). During Montell's tenure, Day supervised a geographical area which included Kentucky and all or portions of five other states. Day was responsible for oversight of the Program Director at FRMC and the 13 other medical facilities within his territory. Although Montell reported to and was supervised by Day during her employment with DCS, Day did not have any day-to-day responsibilities at FRMC and was only present at the facility periodically.

Day worked primarily from his home in West Virginia and traveled to the different medical facilities he supervised.[1]

Montell's specific duties as FRMC's Program Director included supervising employees, conducting community education, reporting charges to Medicare, ensuring that reimbursements were handled properly, attending management meetings with hospital representatives, and meeting regularly with the FRMC hospital liaison. [Record No. 29, p. 17][2] Each of DCS's Program Directors is required to meet certain profit goals for the wound care center he or she oversees. [Record No. 29, p. 17] These profit goals are set by DCS and are generally based upon the profit points for the same time period from the prior year for that wound care center. [*Id.*, p. 19] To assist a Program Director in achieving these goals, DCS requires that he or she attend and participate in quarterly meetings, referred to as "DASH meetings." [*Id.*, pp. 19-20] During these meetings, Program Directors present reports concerning the centers they supervise. More specifically, these reports include goals, attainment levels, and perceived opportunities for improvement of the centers.[3] [*Id.*, pp. 20-21] DCS Program Directors attend these meetings, along with other DCS employees, including AVPs, Regional Directors of Clinical Operations,

---

1      During oral arguments held on July 31, 2013, the plaintiff estimated that Day was present at FRMC about once every month throughout Montell's eighteen-month employment with DCS.

2      One of Montell's more important responsibilities was to ensure that clinical charges are coded correctly so that Medicare's reimbursement of the charge is consistent with billing guidelines. [*Id.*, pp. 18-19] Improper coding can give rise to nonpayment for services rendered, fines, or other potential penalties incurred by the hospital. [*Id.*]

3      As an AVP, Day provided feedback to the Program Directors within his territory concerning reports and presentations.

Reimbursement Managers, and other members of the DCS executive management team. [*Id.*; Record No. 28, p. 26]

Day testified that it became clear to him during the Fall of 2010 that Montell and her center at FRMC were not meeting expectations. Revenue generated by the center was declining due to the lack of patients receiving treatment. Other concerns were raised regarding physician coverage and staffing. [Record No. 28, pp. 25-26] Additionally, Montell failed to meet her performance goals for the beginning of 2010. [Record No. 29, p. 49; Record No. 34-4, pp. 13-14] Montell's performance issues became even more apparent during the October 2010 DASH meeting. According to Day, Montell's presentation during the meeting demonstrated a "[c]omplete lack of understanding of what was driving the business, what was behind it, and the root cause of her issues or problems and how to solve them." [Record No. 28, p. 25] Other DCS employees in attendance, including Program Director Belinda Blair and Day's supervisor, Senior Vice President of Operations ("SVP") Michael Tanner, shared Day's sentiment regarding the lack of quality of Montell's presentation as well as her perceived failure to understand certain key concepts of the business. [*See* Record No. 30, pp. 8, 10-11; Record No. 33, pp. 24-25.] Montell acknowledged that she did not do a good job with her presentation. [Record No. 29, pp. 22, 34]

On November 9, 2010, Day placed Montell on a Performance Improvement Plan ("PIP"). This plan identified Montell's deficiencies regarding Medicare and Medicaid reimbursement issues for FRMC and her lack of understanding of the data contained in DCS's operational reports for the facility. Montell ultimately agreed that she needed to demonstrate a better

understanding of these issues.  [*Id.*, p. 29]  However, despite being placed on a PIP and other occasions of counseling by Day, Montell failed to meet profit goals for the fourth quarter of 2010.  Within a month of the first quarter of 2011, Day notified Montell that the financial statistics for the center were again unsatisfactory.  [*Id.*; Record No. 34-3, p. 47]

In addition to these financial issues, problems continued regarding properly coding reimbursement charges.  By February 28, 2011, these coding issues at FRMC escalated to the point that FRMC's CFO hosted a conference call with the plaintiff and other FRMC and DCS executives to express the hospital's concerns with the continued improper coding of Medicare reimbursement charges.  [Record No. 29, p. 30]  Montell acknowledged that it was her responsibility to make sure that charges were being properly coded, and responded that she was doing the very best she could do.  [*Id.*, pp. 31-32]

Following FRMC's complaint, on March 7, 2011, Montell received a Documented Counseling and Development Plan, indicating that the issues with improper coding were an on-going problem that had been addressed previously with the plaintiff.[4]  Day reiterated Montell's responsibilities concerning these issues and the importance of correcting these problems because they are considered contract compliance issues that can lead to DCS losing FRMC as a client. [Record No. 34-3, pp. 57-64 ; Record No. 30, pp. 29-30]  Although Montell offered a number of excuses, she ultimately took responsibility for the deficiencies.  [Record No. 29, p. 34]

---

4        As part of this plan, Montell was instructed to undergo special training for reimbursement and coding issues with Pat Wolfe, DCS's Manager of Billing and Physician Services.  Montell successfully completed this training on May 2, 2011.

Later in March 2011, Day met with Montell to inform her that it was necessary for her to be in the office during business hours and that she could only conduct out-of-office duties one day per week. Day also informed Montell that she would be required to attend weekly calls with DCS's Reimbursement Manager to review reimbursement issues. [*Id.*, p. 17-18, 34-35; Record No. 34-3, p. 74] The following week, Montell was not at the facility, although she had been instructed by FRMC to be on site for a government inspection. This led to FRMC complaining about Montell's failure to be available during the inspection. [Record No. 29, pp. 40, 45-46] After receiving this complaint,[5] Day contacted Patience McLaughlin, a hospital employee under Montell's supervision, and requested that she monitor and report Montell's arrival time at FRMC wound care center. It appears that Montell had no knowledge of this conversation and was unaware that her arrival time at FRMC was being monitored. [Record No. 37, p. 6]

Around this time, Montell was also preparing for an upcoming DASH meeting. After sending Day a draft presentation, Day responded indicating his disappointment. According to Day, the draft presentation was "at best 50%." He also offered a number of suggestions for improvement. [*Id.*, pp. 44-45; Record No. 34-4, pp. 1-2] On April 12, 2011, Montell sent an e-mail to fellow DCS Program Director Belinda Blair requesting help on her upcoming DASH presentation. In this e-mail, Montell acknowledged that financial numbers at FRMC were "not good" and stated that she felt like Day was "'gunning'" for her. [Record No. 34-4, p. 3]

In the beginning of April 2011, DCS executives began discussing Montell's potential termination. [Record No. 34-6, pp. 38-40] And on April 13, 2011, DCS issued Montell a Final

---

5    Montell indicates that this conversation took place on March 28, 2011. However, Day does not recall the date of the conversation. [Record No. 28, p. 57]

Written Warning ("Final Warning").  [*Id.*, pp. 4-7; Record No. 29, p. 45]  This warning outlined Montell's performance problems and detailed the center's negative growth.  [Record No. 34-4, pp. 4-5]  The warning specifically stated that DCS expected monthly increases in new patients by 3%, encounters by 5% ( *i.e.*, the number of times patients were treated at the facility for any type of treatment), and HBO treatments by 10%.  [*Id.*] This warning explained that further issues would result in discipline up to and including termination.  [*Id.*]

On May 3, 2011, Montell was issued an Amended Final Written Warning ("Amended Final Warning").  [*Id.*, pp. 8-12]  The Amended Final Warning indicated that one of Montell's late arrivals at the FRMC wound care center was included in her original Final Warning in error, but that shortly after being issued the Final Warning, DCS received another complaint from the hospital.  In addition to the original information contained in her Final Warning, the Amended Final Warning stated that, for the month of April, Montell failed to meet two of the three monthly increase metrics, as set out in the Final Warning.  The Amended Final Warning also indicated that Montell was placed on a thirty-day action plan and that any further complaints or failure to meet targets for new patients, encounters, and HBO treatments would result in termination.  [*Id.*]

On May 19, 2011, Day notified Montell that she had failed to attain her performance bonus goals for the first quarter of 2011.  [Record No. 29, p. 49]  As acknowledged by Montell, her performance for the first quarter of 2011 was worse than her performance in the fourth quarter of 2010.  [Record No. 29, p. 49] On the same day, Montell contacted DCS HR Manager Megan Lee and reported inappropriate conduct by Day.  Following this report, Lee contacted

Day and informed him that she (Lee) was investigating a report of sexual harassment filed by Montell.[6]  [Record No. 32, p. 45]

According to Montell, on Friday, May 20, 2011, Day told her that she should either resign or her employment would be terminated.  [Record No. 37, p. 10]  Additionally, Montell stated that Day contacted Barb Vanhoose of FRMC and informed her that Montell had resigned.  [*Id.*] Feeling threatened, Montell called Lee to again report Day and request a reprimand; however, Lee does not recall this conversation.  The next business day (Monday, May 23, 2011), Montell sent an e-mail to Day and Lee indicating that her last day would be Friday, May 27, 2011.

Montell identified the following comments and gesture as the basis for her claim that she was sexually harassed by Day:

> (1)   Day commented to her that "nothing turns me on more than a woman wearing a dress in heels," when she was wearing a dress and heels;
>
> (2)   Day commented to her that "nothing turns me on more than a woman wearing a red dress and heels," when she was wearing a red dress and heels; and
>
> (3)   Day commented to her that "when people first meet you, they may think you are an air-head, until they get to know you," while making an hourglass shape with his hands.

[Record No. 29, pp. 35, 37-38; Record No. 34-4, pp. 22-23]  Montell testified that Day prefaced his two dress and heels comments by stating "I know you can get me in trouble.  Don't call HR on me."  [Record No. 29, pp. 37-38]

Although Montell claims that Day commented on her appearance every time he saw her, she acknowledged that, at first, she appreciated these comments and took them as compliments.

---

6       Lee interviewed Montell and Blair as part of her investigation.  [Record No. 32, pp. 44-45]  DCS eventually concluded that there was no evidence to support Montell's complaints.  [Record No. 31, p. 45]

[*Id.*, p. 37] And when questioned about what comments she perceived to be inappropriate, Montell only identified the above three comments. [*Id.*, pp. 37-38; Record No. 29-1, pp. 4, 7] There are no witnesses to these incidents and Montell's report to Lee was the first time she complained about Day's conduct. Montell testified that Day never inappropriately touched her, or attempted to do so, and that he never requested any sexual favors.[7]

On May 2, 2012, Montell filed this lawsuit against DCS and Day. She asserts claims of general harassment, intentional infliction of emotional distress, retaliation, and negligence. The defendants have moved for summary judgment on all of Montell's claims. On July 31, 2013, the Court heard oral arguments on the motion for summary judgment.

## II.

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

---

7       Day denies making the alleged comments and the hourglass gesture. The defendants also deny Montell's recitation of the events that transpired on May 19-23, 2011. Specifically, they contend that Montell did not complain about Day's alleged harassment until after she resigned.

A party moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the nonmoving party must present "significant probative evidence" of a genuine dispute . . . to defeat the motion for summary judgment. *Chao*, 285 F.3d at 424. The nonmoving party cannot rely upon the assertions in its pleadings; rather, it must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324. In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

## III.

Montell alleges that she was retaliated against following her report to Lee that Day has sexually harassed her during her employment with DCS. She contends that this alleged retaliation caused her to be constructively discharged. Montell asserts claims against Day for harassment, in violation of KRS § 525.070, and intentional infliction of emotional distress. Montell asserts claims of retaliation against DCS for complaining about Day's sexual harassment and negligent hiring, supervision, and retention. The defendants contend that Montell's claims are not supported by the undisputed fact or applicable law. Because there is no genuine issue

-10-

of *material* fact, the defendants contend that summary judgment is appropriate for each of Montell's claims.

### A.     Harassment Claim

Montell alleges that Day harassed her in violation of KRS § 525.070[8] and that he is individually liable under KRS § 446.070 which allows a private cause of action for civil damages to any individual injured by the violation of any statute.  KRS § 446.070. [9] [*Id.*, pp. 22-23] The statute provides, in part, that:

> (1)     A person is guilty of harassment when, with intent to intimidate, harass, annoy, or alarm another person, he or she:
>
>        (e)     Engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose
>  . . . .

---

8       During oral argument, the plaintiff conceded that she is unable to assert a colorable claim of sexual harassment.

> The Court:        . . . [I]f this were just a pure sexual harassment [claim], you would almost have to concede, based on these isolated events, that probably wouldn't be sufficient under Title VII.  It's the retaliation, really, that's your case in essence, isn't it?
>
> Mr. Peterson:     You hit the nail on the head, Your Honor.
> . . .
>
> The Court:        So it's the retaliation essentially that's the focus of your case.
>
> Mr. Peterson:     Correct.

[Tr., July 31, 2013, Pretrial Conference] Instead, Montell argues that she has a viable general harassment claim pursuant to KRS § 525.070.

9       The plaintiff indicates that her harassment claim does not rely on KRS § 525.070(1)(c), which prevents any person from making "an offensively coarse utterance, gesture, or display, or addresses abusive language to any person present."  KRS § 525.070(1)(c).  Indeed, Montell concedes that this section of the Kentucky Revised Statutes has been held to be unconstitutionally broad and overly vague.  [Record No. 37, p. 22; *see also Musselman v. Commonwealth*, 705 S.W.2d 476, 478 (Ky. 1986); *United States v. Sturgill*, 563 F.2d 307, 310 (6th Cir. 1977).]

-11-

KRS § 525.070(1)(e).

Harassment under KRS § 525.070 "requires proof of the additional fact of intent to harass, annoy or alarm another person." *Hart v. Commonwealth*, No. 87-CA-2064-MR, 1989 Ky. App. LEXIS 47, at *6 (Ky. Ct. App. Apr. 21, 1989). Additionally, KRS § 525.070(1)(e) requires that the defendant's conduct actually results in another person being alarmed or seriously annoyed. Therefore, a plain reading of the statute indicates that simple expressions of dislike, discomfort, uneasiness, or displeasure are insufficient to state a claim. *Id.*; *see also* KRS § 525.070 cmt. (1974) (noting that KRS § 525.070 is "intended to cover those acts which constituted simple assault under prior law. It is intended to include nonconsensual touching which does not result in physical injury and conduct which is intended to harass or annoy an individual rather than the public.").

The defendant's argue that "it defies logic to even suggest that [Day's conduct] could constitute a violation of KRS § 525.070 for which a plaintiff can recover civil damages." [Record No. 42, p. 5] However, Montell argues that she has raised a genuine issue of fact regarding her harassment claim. She contends that Day made unwanted comments about her appearance "every time" he saw her, as well as statements of what sexually aroused him, and that these comments served no legitimate purpose. [*Id.*] Further, she asserts that these comments "alarmed [her] so much that she intentionally avoided Day when he would present to FRMC for meetings." [Record No. 37, p. 23]

In support, Montell relies on *Massey v. MBNA American Bank, N.A.*, No. 1:05CV-44-M, 2005 U.S. Dist. LEXIS 28756 (W.D. Ky. Nov. 17, 2005), where the district court declined to

-12-

dismiss a *pro se* plaintiff's harassment claim in connection with the alleged reporting of adverse credit information by a bank.  In *Massey*, persons identifying themselves as employees of the defendant called the plaintiff's residence "up to 19 times per day," falsely stating that the plaintiff was liable for his wife's credit card debt.  *Id.* at *1.  These individuals threatened that the defendant would "'see to it that derogatory credit information' would be given to the credit reporting agencies."  *Id.* at *2.  In analyzing the plaintiff's harassment claim, the district court explicitly questioned whether such a claim is even recognized as an independent cause of action under Kentucky law, but concluded that due to lack of the factual record at that stage of the proceedings, dismissal would be premature.  *Id.* at *12.

Montell's reliance on Massey is misplaced.  The underlying conduct which forms the basis of the alleged harassment differ vastly in nature and frequency.  In contrast to the nineteen phone calls per day the *Massey* plaintiff received, this case involves three instances that allegedly occurred over eighteen months.[10]  As Montell stated, Day's two comments regarding a woman in heels and a dress and the one hourglass gesture were inappropriate and very unprofessional. [Record No. 29, p. 38] But these incidents do not rise to the level of actionable harassment.

Montell states that after Day made the hourglass gesture and air-head comment, she became visibly upset and began to cry.  However, she concedes that after she began to cry, Day immediately apologized, stating "'I didn't mean to hurt your feelings, didn't mean to hurt your feelings.'"  [*Id.*, p. 36]  Further, Montell stated that following this incident, Day never again

---

10    The exact dates of the alleged incidents has not been provided to the Court.  During oral arguments, plaintiff's counsel stated that he believed these incidents took place around October or November of 2010. However, Montell's testimony indicates that the air-head comment and hourglass gesture took place at a March 17, 2011 meeting.

made any type of similar gesture or any reference to her being an air-head. [*Id.*]  This testimony belies the plaintiff's contention that Day possessed the requisite intent to harass, annoy, or alarm her as required by KRS § 525.070. *See Hart*, 1989 Ky. App. LEXIS 47, at *6.

Although Montell asserts that Day commented on her appearance every time he saw her, she has indicated that she only saw Day about once a month.  And while Montell testified that Day made her feel so uncomfortable that she would make-up excuses to avoid having lunch with him when he was in the office.  At first, Montell received these comments as compliments. [Record No. 29, p. 37]  Montell identified these other comments as being along the lines of statements such as, "Oh, that's a really nice suit."  [*Id.*]  Additionally, despite Montell's contention that Day's air-head comment and the hourglass gesture made her cry, her testimony indicates that her emotional break-down was just as much brought on by her belief that Day believed she was not competent in handling certain Medicare issues as it was about the distasteful nature of his gesture and words.[11]

---

11      Montell testified that, before Day made the air-head comment and hourglass gesture she was already upset with him and stated that she felt like he had "thrown me under the bus," on a previous conference call with other DCS and FRMC executives.  [Record No. 29, p. 35]  Specifically, she testified:

    A.      I felt like he – you know, he was not supportive at all, you know, it was everything was my fault.

    Q.      When you say not supportive at all, you mean not supportive of you in response to the concerns raised by the CFO?

    A.      No, I just mean, you know, I feel like he just threw me completely under the bus.

    Q.      In what context?

    A.      You know, in front of the CFO and Barb and Valerie and Osman.

    Q.      So you were trying to communicate your feeling that he threw you under the bus during that . . . February 28 conference call[?]

-14-

Regardless, these allegations do not demonstrate that Day's conduct alarmed or seriously annoyed the plaintiff, but instead support a finding of simple displeasure and discomfort, which is insufficient to support a claim under KRS § 525.070(1)(e).  Moreover, the record is devoid of any additional evidence that Day acted with the intent necessary for a viable claim of harassment.  In short, a review of the nature of these alleged comments, along with the temporal proximity between the incidents of the alleged conduct demonstrates there is no issue of material fact concerning Montell's general harassment claim pursuant to KRS § 525.070(1)(e).[12]

## B.    Intentional Infliction of Emotional Distress/Outrage

---

A.    Yes.

Q.    What did he say during that February 28 conference call that caused you to feel like you were being thrown under the bus?

A.    Can't recall the specifics, but it was as if, you know – you know, I just wasn't competent and, you know, just very condescending.

[*Id.*]

12    The defendants also argue that Montell's harassment claim under KRS § 525.070 is preempted by KRS § 344.040, which expressly and specifically prohibits workplace sexual harassment by employers. [Record No. 36-1, pp. 14-16]  The defendants assert that the applicable rule of statutory construction is that "where there is both a specific statute and a general statute which are seemingly applicable to the same subject, the specific statute controls."  [*Id.*, p. 15 (citing *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 819 (Ky. 1992); *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985))]  And because KRS § 344.040 preempts Montell's harassment claim, her only potential claim would be for sexual harassment, which would bar a viable claim against Day in his individual capacity because he is not considered an "employer" under KRS § 344.040.  [*Id.*, p. 16 (citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997); *Walker v. MDM Servs. Corp.*, 997 F. Supp. 822, 823 (W.D. Ky. 1998))]  The defendants further argue that if the Kentucky legislature intended to impose individual liability for violations of KRS § 344.040 for workplace sexual harassment, the legislature would have used the same language it did in KRS § 344.280.

Montell wholly ignores the defendant's argument on this point.  Indeed, she cites no cases in which a court has applied KRS §§ 446.070 and 525.070 to claims of alleged harassment that are sexually oriented and have an employment-related nexus, and the Court is unaware of any such application of these statutory provisions in this manner.  While the defendants' arguments on this point are persuasive, the Court need not base its decision on the issue of preemption because the harassment claim fails as a matter of law.

Montell also asserts a claim for intentional infliction of emotional distress ("IIED") against Day.  This IIED claim is based upon the same alleged conduct which forms the basis of her general harassment claim.  The record of this matter, however, is devoid of any factual content that would give rise to a colorable IIED claim.

To establish an IIED claim under Kentucky law, the plaintiff must demonstrate: "1) the wrongdoer's conduct must be intentional or reckless; 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4) the emotional distress must be severe." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004).  The Court must determine whether the alleged conduct could "reasonably be regarded as so extreme and outrageous as to permit recovery."  *Id.* at 789-90.

Applying this restrictive standard, none of the conduct alleged in this civil action was "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Hall v. Consol of Ky., Inc.*, 162 F. App'x 587, 591 (6th Cir. 2006) (quoting *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990)); *see also Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000) (opining that the tort of IIED "is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees"); *Stringer*, 151 S.W.3d at 791 (noting that Kentucky courts have "set a high threshold for IIED/outrage claims").  At most, Montell has alleged conduct that is the equivalent of "petty insults, unkind words and minor indignities" that,

as a matter of law, does not support an IIED claim.  *See Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996).

Moreover, contrary to Montell's position, the cases which she cites in support of her IIED claim are not analogous and are not "clearly consistent" with the facts of this matter.  Montell relies on cases where: (1) the defendant sheriff allegedly kept one of the plaintiffs under surveillance at both work and home, threatened to put her husband in jail, and forced her vehicle into an opposing lane of traffic while driving, *Craft v. Rice*, 671 S.W.2d 247, 248 (Ky. 1984); (2) the defendant either consciously or recklessly exposed the defendant to asbestos, *Capital Holdings Corp. v. Bailey*, 873 S.W.2d 187, 189 (Ky. 1994); (3) the defendant company was "well aware" and possessed special knowledge of the plaintiff's precarious mental condition and, as a result of the defendant's behaviour, the plaintiff "experienced real and disabling depression," his psychotherapist recommended that he be placed on total disability, and the company's examining physician found it "medically necessary" to engage the plaintiff in a non-suicide pact, *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 66-67 (Ky. 1996); and (4) the plaintiff was allegedly subjected to racist remarks virtually every day during his employment of approximately seven years with the defendant company.  *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 237-38 (Ky. App. Ct. 2001).

Day's actions do not meet the threshold that Kentucky courts have set for finding actionable conduct in IIED cases.[13]  *Stringer*, 151 S.W.3d at 791.  Here, Montell was never

_____

13      To the extent Montell contends that she was spied upon at the direction of Day, these facts are distinguishable from the conduct of the defendant sheriff in *Craft*, 671 S.W.2d 247.  Day requested that McLaughlin monitor Montell's arrival time at FRMC wound care center, after receiving complaints from FRMC that Montell was not in the office when she was instructed to be.  [Record No. 34-5, pp. 11-12; Record

-17-

threatened or put in danger.  Likewise, there is no evidence she was subjected to continuous or consistent sexual harassment for an extended period of time.  Even assuming Day's conduct constituted sexual harassment "every time" they saw each other, Montell only encountered Day about once a month during her eighteen-month employment.  And Montell acknowledges that she considered many of Day's early comments to be compliments.

Further, there is also no evidence that Montell suffered severe emotional distress as required for an actionable IIED claim.  Montell testified that, due to Day's alleged conduct, the circumstances were "stressful," and that her "stomach would be in a knot."  [Record No. 29-1, p. 10]  Yet, she never saw a medical or mental health professional for any distress she allegedly suffered as a result of Day's conduct.  [*Id.*]  In summary, Montell has failed to establish that Day's alleged conduct was either severe or outrageous, or that she suffered from severe emotional distress as a result of Day's alleged conduct.  Summary judgment, therefore, is appropriate regarding the IIED claim.

### C.      Retaliation

---

No. 42, pp. 5-6]  Montell also testified that she understood that Day received complaints from FRMC about her not being in the office after she was instructed to be there.  [Record No. 29, p. 46]  Simply put, Day's actions do not support a finding of intentional or reckless conduct which is outrageous and intolerable. Montell's arrival time at work was monitored by her employer.  She was not kept under surveillance at her home or while she was away from work, or even while she was at work.  *Cf. Craft*, 671 S.W.2d at 248 (where defendant sheriff kept plaintiff under surveillance at both home and work).  While Day did not choose the most tactful way of achieving this end, his actions cannot be characterized as being "truly outrageous, intolerable and which results in bringing one to his knees," either when viewed in isolation or in totality. *Osborne*, 31 S.W.3d at 914.

Montell claims that she was constructively discharged in retaliation for reporting Day for sexual harassment.[14] [Record No. 1-1, p. 54 ¶¶ 21-22]  Specifically, her Complaint states that she reported Day to DCS for sexual harassment, and that "because of her report, [DCS] constructively discharged her from her employment." [*Id.*]  The defendants, however, argue that the "undisputed facts fail to show that Plaintiff engaged in [a] protected activity and fail to show any causal connection between her complaint to Human Resources about Day and her alleged constructive discharge." [Record No. 42, p. 6]

Claims under the Kentucky Civil Rights Act of 1964 ("KCRA") are viewed in consonance with Title VII of the Civil Rights Act of 1964. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).  KRS § 344.280 makes it unlawful for an employer to "retaliate or discriminate in any manner against a person because [she] has opposed a practice declared unlawful by this chapter, or because [she] has made a charge, [or] filed a complaint . . . ."  KRS § 344.280(1).  To establish a *prima facie* case under either Title VII or the KCRA, a plaintiff alleging retaliation must show that: (1) she "engaged in an activity protected by Title VII;" (2) the "exercise of [her] civil rights was known by the defendant;" (3) "thereafter, the defendant took an employment action adverse to the plaintiff"; and (4) "there was a causal connection

---

14    Montell's proposed jury instructions contain a number of instructions involving a retaliation claim against Day in his individual capacity. [Record No. 51, pp. 2-14]  The defendants objected to the inclusion of any such instructions. [Record No. 56, p. 1-2]  To the extent Montell contends that Day is personally liable for an alleged violation of KRS § 344.280, the Court notes her Complaint only names DCS as the defendant subject to her retaliation claim. [Record No. 1-1, p. 4 ¶¶ 20-23]  The plaintiff, therefore, will not be allowed to assert a back-door retaliation claim against Day in his individual capacity.  Further, she has provided no arguments concerning Day's individual liability in connection with this claim.  *See AbdulSalaam v. Franklin Cnty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009) (noting that it is not the Court's responsibility to research and construct the party's arguments).  Regardless, a retaliation claim against Day in his individual capacity would also fail for the same reasons as the claims asserted against DCS.

between the protected activity and the adverse employment action." *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004) (internal quotation marks omitted); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012). As the Supreme Court has recently clarified, a plaintiff alleging a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

In assessing mixed-motive retaliation claims or those based on circumstantial evidence, the Court applies the *McDonnell Douglas* burden-shifting scheme. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005). Under this framework, if the plaintiff is able to satisfy the *prima facie* elements of her retaliation claim, the burden of production shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Hamilton*, 556 F.3d at 435. The plaintiff must then demonstrate, by a preponderance of the evidence, that the stated reason is merely pretextual. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). If, however, the plaintiff fails to establish a dispute of material fact with respect to any one of the *prima facie* elements, summary judgment is appropriate. *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002).

### 1.    Protected Activity

Montell must first demonstrate that she engaged in a protected activity. *See Brooks*, 132 S.W.3d at 803. Because she did not "participate in a proceeding" with the Equal Employment Opportunity Commission ("EEOC") or the Kentucky Commission on Human Rights ("KCHR"),

-20-

she must prove that she "opposed [] an apparent Title VII violation," which is also known as the "opposition clause." *See Wasek*, 682 F.3d at 469, 471(citations omitted); *see also* KRS § 344.280(1).  To satisfy the opposition clause, a plaintiff must have a "reasonable and good faith belief that the opposed practices were unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (quotation marks and citations omitted).  "The reasonableness requirement is necessary because it ensures that the employer understood, or at least could reasonably have understood, that the plaintiff was opposing unlawful conduct." *Stanley v. Insights Training Grp., LLC*, No. 3:09-CV-00231, 2013 U.S. Dist. LEXIS 1428, at *20 (W.D. Ky. Jan. 4, 2013).

DCS contends that the comments alleged to have been made by Day "amount to three isolated, offhand comments — not sexual harassment," and that it is "wholly unreasonable for Plaintiff to believe that three comments constituted actionable sexual harassment."  [Record No. 36-1, p. 19]  DCS argues that "the courts have uniformly held that not all workplace conduct that has sexual overtones can be characterized as unlawful harassment — simple teasing, offhand comments, and isolated incidents will not amount to sexual harassment."  [*Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998))]  DCS concludes that "no reasonable person could have believed" that Day's alleged comments violated the law and that, accordingly, Montell did not engage in a protected activity and her retaliation must, therefore, be dismissed.[15]  [Record No. 42, p. 9]

---

15      DCS also asserts that neither DCS HR representative Lee nor Day agreed with the plaintiff that the comments would constitute sexual harassment.  [Record No. 42, pp. 7-8]

-21-

However, the inquiry is not whether the activity Montell opposed actually constituted unlawful discrimination.  Instead, the question is whether she had a reasonable and good faith belief that she was opposing an unlawful activity.  Montell complained to HR that Day made "inappropriate comments of a sexual nature to her in the past," thus putting DCS on notice that she believe she had been the victim of sexual harassment.  [Record No. 34-4, p. 22; *see Stanley*, 2013 U.S. Dist. LEXIS 1428, at *20.]  Viewing the evidence in the light most favorable to Montell, she has sufficiently raised a genuine issue of material fact concerning whether she had a reasonable, good faith belief that the conduct she was reporting was unlawful, and ultimately whether she engaged in a protected activity.  *See Finch v. Xavier Univ.*, 689 F. Supp. 2d 955 (S.D. Ohio 2010) ("Whether Plaintiffs lodged their discrimination complaints in good faith is quintessentially a credibility question for the jury to decide.").

### 2.    Causation

Next, DCS asserts that Montell is unable to demonstrate any genuine issue of material fact regarding a causal connection between her complaint to HR and her alleged constructive discharge.  "When an employee is disciplined in close proximity to his or her protected activity, such proximity provides 'highly probative evidence of a causal connection' between the adverse employment action and the protected activity.  *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 446 (6th Cir. 2008) (quoting *Arendale v. Cty. of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008)).  However, the Sixth Circuit has "repeatedly cautioned against inferring causation based on temporal proximity alone."  *Wasek*, 682 F.3d at 471-72; *see also Spengler v.*

*Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("[T]emporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim.").

Despite this, as argued by the defendants, no causal connection exists between a protected activity and an adverse employment action when an employer was already contemplating the adverse employment action prior to the protected complaint. *See Univ. of Louisville Ath. Ass'n, Inc. v. Banker*, No. 2011-CA-001436-MR, 2013 Ky. App. LEXIS 19, at *12 (Ky. Ct. App. Feb. 1, 2013) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). It is not required that the adverse employment action was definitively decided upon; rather, it is only required that "the employment action had been contemplated prior to the knowledge of the protected activity." *Id.* at *17. The plaintiff does not refute this point. Instead, relying on *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004),[16] she argues that her report of harassment was made on May 19, 2011, and that she was threatened by Day to either resign on May 20, 2011, or be fired.[17]

---

[16]   In *DiCarlo*, the Sixth Circuit held that "in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Id.* at 421.

[17]   As noted above, the defendants refute Montell's recitation of events that on May 19, 2011, she reported Day to HR and that the following day, on May 20, 2011, Day called, threatening her that if she did not resign he would fire her. [Record No. 37, p. 9-10] Montell also claims that Day later contacted Barb Vanhoose and told her that Montell had resigned, and that Vanhoose then called Montell informing her that Day had contacted her and told her that Montell had resigned and that she was inquiring whether this was true. [*Id.*] Montell contends that her conversation with Vanhoose took place at 3:27 p.m., on May 20, 2011, and lasted two minutes. [*Id.*] After her conversation with Vanhoose, Montell testified that she contacted Lee a second time, to again report Day and request a reprimand for retaliation. She argues that this conversation took place at 4:42 p.m., on May 20, 2013, and lasted twenty-three minutes. [*Id.*] The next work day, Monday, May 23, 2011, Montell sent an e-mail to Lee and Day resigning and giving notice that her last day of employment would be May 27, 2011. [Record No. 34-4, p. 21]

      In support this version of events, Montell attaches copies of her telephone records for April 29, 2011, to June 5, 2011. [Record No. 37-2] However, she provides no foundation for these records, beyond a footnote that reads "See phone records of Montell . . ., Exhibit B." [Record No. 37, p. 10] Because no foundation has been laid, the Court may not consider these documents when ruling on a motion for summary

[Record No. 37, p. 18]  Montell contends that the defendants had knowledge of her report and that she was constructively discharged within a day of that report.  [Record No. 37, p. 18 (citing *DiCarlo*, 358 F.3d at 421)]

In *Reynolds v. Extendicare Health Services*, 257 F. App'x 914, 920 (6th Cir. 2007), the Sixth Circuit clarified the holding in *DiCarlo*.  The *Reynolds* court opined that in *DiCarlo*, because the "decision to terminate and the actual termination both happened shortly after the plaintiff engaged in a protected activity, the court allowed this fact to serve as indirect evidence of a causal connection."  *Reynolds*, 257 F. App'x at 920 (citing *DiCarlo*, 358 F.3d at 421). However, distinguishing *DiCarlo*, the *Reynolds* court held:

> The present case involves a different timing of events. Here, defendants had decided to place [the plaintiff] on the [Performance Improvement Plan] before she engaged in protected activity. We have recently reiterated the general rule that "temporal proximity itself is insufficient to find a causal connection . . . ."  We

---

judgment.  *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (noting it is well-settled that a court cannot consider inadmissable hearsay when reviewing a motion for summary judgment); *see also United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005); Fed. R. Evid. 803(6).

Regardless, even in considering these telephone records, they only indicate the dates and times that calls were made, but they provide no insight to with whom the plaintiff spoke, or the substance of any conversation.  Additionally, the telephone records do not show that a telephone call from Montell to DCS on May 19, 2011 — the day she states that she initially reported Day to Lee. [Record No. 37-2, pp. 12-13] Although Montell contends that Day called her on May 20, 2011, threatening her employment, and that she was then contacted by Vanhoose, the telephone records do not support her version of events.  No phone call from Day on May 20, 2011 is notated in the phone records.  Additionally, the phone call from Vanhoose, is the first phone call the plaintiff received that date.  [*Id.*, p. 13]

The telephone records, however, indicate that a phone call to DCS was made on May 23, 2011, at 3:44 p.m., which lasted fifty-four minutes.  [*Id.*, p. 17]  This is consistent with Lee's testimony, as well as her investigative report, which indicates that Montell's initial report of Day took place on May 23, 2011, at 3:45 p.m., after her resignation.  [Record No. 32, p. 38; Record No. 34-4, p. 22]  This is also consistent with the defendants' position that Montell did not file her complaint against Day until May 23, 2011, and that Montell's report was not until after she informed Day and Lee that she was resigning. [Record No. 36-1, p. 11]  Nonetheless, in viewing the evidence most favorable to the plaintiff, and using the time-line of events as alleged by Montell, her claim of retaliation still lacks merit.

-24-

noted that, although temporal proximity alone is not sufficient to establish a causal connection, "a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."

*Id.* at 920 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 469 F.3d 584, 596(6th Cir. 2006)).

Here, it is undisputed that before Montell filed her report with HR, she had already been issued a Final Warning and an Amended Final Warning, and these warnings explicitly stated that her failure to comply could lead to her termination.  Additionally, she was notified that she failed to reach her bonus performance goals for the first quarter of 2011.  This all took place prior to May 19, 2011.  In short, the temporal proximity of the events is undermined by the events that occurred prior to her report.  Montell is unable to establish a causal connection, and summary judgment on her retaliation claim in favor of the defendants is appropriate.

### 3.    Non-Discriminatory Explanation and Pretext

Even assuming Montell were able to establish a *prima facie* claim of retaliation, her Final and Amended Final Warnings, along with the financial data are all legitimate, non-retaliatory reasons for her termination of employment.  Montell maintains that these reasons are "red herrings" and that she was not in danger of losing her job at DCS.  Essentially, these assertions are an attempt to argue pretext.  However, her retaliation claim would still fail because she is unable to prove that her protected activity was the "but-for cause" of the adverse employment action by her employer. *Nassar*, 133 S. Ct. at 2534.  Put another way, Montell must demonstrate that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* at 2533.

Montell asserts that she was "successfully operating the FRMC wound care center." [Record No. 37, p. 4]  In support, she relies on assorted financial data of the FRMC wound care center from 2009 to 2011, and contends that this data supports that revenue increased during her tenure as the Program Director at FRMC — a fact which the defendants do not dispute.  [Record No. 42, p. 11]  However, the FRMC wound care center opened in 2009, and DCS executives testified that this increase in revenue is related to timing and not necessarily any indication of Montell's performance, and that there is an expected dramatic increase in the revenue numbers for new wound care centers.  [Record No. 28, p. 56; Record No. 33, p. 74]

Montell also argues that she received a 2% salary increase in March of 2011, and that this is evidence that she was successfully operating the wound care center at FRMC.  [Record No. 37, p. 4]  However, Montell's conclusion that this salary increase was in any way tied to her performance is not supported by evidence but is, instead, a speculative allegation.  In fact, the e-mail from Day notifying Montell when the salary increase would be effective, explicitly referred to it as an "annual salary increase."  [Record No. 34-6, p. 5]  Additionally, Day testified that as an AVP he tends to "err on [the side of] giving employees a salary increase to offset cost of living," and that Montell's salary increase (or any other employee's salary increase) would not have necessarily been tied to performance.  [Record No. 28, p. 67]  Montell's unsupported speculation to the contrary is insufficient to defeat a motion for summary judgment.  *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990).

-26-

It is undisputed that as of May 19, 2011, Montell had been issued a Final Warning and an Amended Final Warning,[18] which dictated that she was required to meet certain monthly goals.  Specifically, the FRMC wound care center would need to increase new patients by 3%, encounters by 5%, and HBO treatments by 10%.  When Montell ended her employment the following month, she had only met one of these goals.  While Day testified that did not have any definite plans to terminate Montell's employment when she gave her notice of resignation, her failure to meet these goals would result in her termination, as was explicitly stated in both of the warnings.  Therefore, the defendants have demonstrated that Montell was facing potential termination in response to her own conduct, not her sexual harassment complaint.  And because the warnings were issued before her alleged complaint to HR, no reasonable juror could infer that Montell's May 19, 2013 complaint to HR was the but-for cause of her constructive discharge.  *Nasser*, 133 S. Ct. at 2534.

### D.      Negligent Hiring, Supervision, and Retention

Finally, the defendants request entry of summary judgment on Montell's claim of negligent hiring and retention.  The underlying theory of this claim is that an employer must use ordinary care in the selection and retention of an employee.  *See Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. 1998).  Liability is not based upon a theory of *respondeat superior*.

---

18      Montell contends that "Day [] violated company policy by refusing to follow the progressive disciplinary policy required and implemented by DCS," and that "DCS imposes a progressive discipline policy which requires an employee to receive oral counseling, a written warning, a final written warning and then termination."  [Record No. 37, p. 7]  However, DCS's Employee Handbook, explicitly states in bold print: "the Company reserves the right to skip oral and/or written discipline and move straight to suspensions or termination when it believes in its discretion that such action is appropriate."  [Record No. 34-2, p. 67]  This belies Montell's assertion that company policy was violated when Day issued oral counseling to Montell on March 7, 2011, and then moved the Final Warning on April 13, 2011.  [Record No. 37, p. 7]

Instead, "the employer's liability may only be predicated upon its own negligence in failing to exercise reasonable care in the selection or retention of its employees." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 732 (Ky. 2009). To prevail on a negligent hiring and retention claim under Kentucky law, a plaintiff must prove: (1) the employer knew or reasonably should have known that the employee was unfit for the job in which he was employed; and (2) the employee's placement or retention created an unreasonable risk of harm to the plaintiff. *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000) (citing *Oakley*, 964 S.W.2d at 442); *see also Haley v. City of Elsmere*, No. 2008-106 (WOB), 2010 U.S. Dist. 91641, at *25 (E.D. Ky. Aug. 31, 2010) (noting that "[t]his concept of forseeability is evaluated under the totality of the circumstances").

Montell's claim of negligent hiring and retention fails on a number of grounds. As an initial matter, because the Court has concluded that Day's conduct does not constitute harassment (sexual or otherwise), DCS cannot be held liable under a theory of negligent hiring or retention. *Ten Broeck Dupont, Inc.*, 283 S.W.3d at 727 ("In order for an employer to be held liable for negligent hiring or retention the employee must have committed a tort." (internal quotation marks, citations, and alterations omitted)). Additionally, the defendants argue that under Kentucky law the tort of negligent hiring and retention is limited to claims against an employer whose employee caused harm to a third party, not another employee. [Record No. 36-1, pp. 21-22] In support, they rely on *Hen v. Pinnacle Publishing, LLC*, where the district court considered the viability of a claim for the negligent hiring and supervision of the plaintiff's former supervisor. No. 12-307-KSF, 2012 U.S. Dist. LEXIS 173623, at *6-7 (E.D. Ky. Dec. 7,

2012).  In dismissing the plaintiff's claim, this Court opined that the plaintiff "has cited no Kentucky cases which allow an employee to sue his own employer under a negligence theory for an alleged hostile work environment created by a coworker or supervisor," but instead the plaintiff is "camouflaging his untenable hostile work environment claim as a negligence claim." *Id.*

Montell does not directly address this argument, but instead mis-characterizes the facts of *Oakley*.  Contrary to Montell's recitation, *Oakley* involved a claim against an employer (Flor-Shin, Inc.) whose employee injured Oakley, a K-Mart employee. 964 S.W.2d at 439.  Oakley's underlying negligent hiring claim was against Flor-Shin, Inc., not her own employer K-Mart. *Id.*  In short, the defendant's position is well-taken.  The other cases cited by Montell either do not apply Kentucky law or do not involve an employee suing her employer for negligent hiring or retention of another employee.

Next, there is no evidence that DCS negligently trained Day.  In fact, Montell does not argue that Day was deficiently trained.[19]  Likewise, the record is devoid of any evidence that DCS knew or reasonably should have known at the time of Day's hiring that he posed a risk of harassment or sexual harassment to its employees.  Thus, any claim for the negligent hiring or training fails because it lacks any factual support from the record.  [Record No. 37, p. 24]

_____

19    DCS avers that it is committed providing a workplace that is free from illegal discrimination and harassment.  In support, its Equal Employment Opportunity provision of its Employee Handbook, which prohibits illegal discrimination and retaliation and outlines the procedures by which employees may report complaints and seek redress.  [Record No. 34-2, p. 10-16; Record No. 32, pp. 12-14] Employees are directed to report any conduct which they believe is prohibited to their supervisor, manager, or HR.  DCS also provides an anonymous company hotline number to report complaints of misconduct. Additionally, DCS requires annual sexual harassment training of all employees.  [Record No. 31, p. 19]

-29-

Montell relies on the affidavit of former DCS Program Director Laura Joyce in support of her allegation that there exists a "genuine issue of material fact for jury consideration [regarding] whether Day was negligently retained by DCS and posed a risk to Montell." [*Id.*, p. 24] Joyce claims that Day would often make comments about her appearance that caused Joyce to feel "uncomfortable and intimidated," and that Day would always preface his remarks with "don't tell HR," and "you could get me in trouble for this." [Record No. 37-4, p. 1] Joyce alleges that she "reported Austin Day to HR on multiple occasions." [*Id.*] Montell argues that, if DCS had properly "investigated Joyce's claims of sexual harassment, Day's sexual harassment of Montell could have been prevented." [Record No. 37, p. 24]

Although Joyce's affidavit states that she reported Day to HR, the affidavit does not specifically state that she reported Day for harassment, nor does she specifically allege that Day harassed her. [*See* Record No. 37-4, p. 1.]  Further, Montell testified that although Joyce told her that she spoke to HR about a number of issues, Montell testified that Joyce told her that she never reported Day for sexual harassment.[20] [Record No. 29, p. 42, Record No. 29-1, p. 7] This is consistent with all the other evidence and testimony in this matter that, prior to Montell's complaint, DCS had never received a complaint of inappropriate behavior on the part of Day. [Record No. 32, p. 12; Record No. 28, p. 21]  Further, it is uncontested that DCS immediately

---

20      Montell also testified that Joyce only identified two alleged comments by Day that Joyce believed to constitute sexual harassment.  Specifically, Day told Joyce one occasion that people thought that he and Joyce were having an affair and another time Day said "you're too pretty" in reference to Joyce. [Record No. 29-1, p. 7] Again, Montell testified that Joyce told her that she never reported Day to HR for sexual harassment and never reported these alleged two comments. Even if she did, these two comments alone would not constitute sexual harassment or harassment, and certainly would not impute knowledge or reasonable belief on the part of DCS that Day was unfit for his job or that his continued retention would create an unreasonable risk of Day sexually harassing Montell.

investigated Montell's allegations concerning Day following her complaint.  In short, Montell has failed to present significant probative evidence of a genuine issue of material fact that there was a foreseeable risk of harm to the plaintiff.  DCS, therefore, is entitled to summary judgment on this claim.

## IV.

Finally, the defendants' have moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927.  [Record No. 43]  They assert that, because Montell's claims are frivolous and unsupported by law or fact, the imposition of sanctions is necessary. In response, Montell argues that her claims have substantial merit.  As a result, she requests an award of attorneys' fees and reimbursement of costs incurred for responding to the defendants' motion.  [Record No. 45, p. 2]

In the Sixth Circuit, the test for the imposition of Rule 11 sanctions is "whether the individual's conduct was reasonable under the circumstances," *Union Planters Bank v. L&J Dev. Co.,* 155 F.3d 378, 384 (6th Cir. 1997) (citations omitted).  Further, an award of sanctions requires a showing of "objectively unreasonable conduct."  *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002) (citations omitted).  When examining legal arguments, the Court should determine whether the assertion was frivolous or whether the attorney had a reasonable basis for making the claim. *See Tropf v. Nat'l Title Ins. Co.,* 289 F.3d 929, 939 (6th Cir. 2002).  Additionally, "[f]ailure on the merits is *not* synonymous with frivolousness" and "the court imposing Rule 11 sanctions need not make a finding of bad faith." *Merritt v. Int'l Ass'n of Machinists & Aero. Workers*, No. 2:06-CV-14342, 2008 U.S. Dist.

LEXIS 108361, at *69-70 (E.D. Mich. Sept. 22, 2008) (quotation marks and citations omitted) (emphasis in the original).    Under 28 U.S.C. § 1927, sanctions may be appropriately awarded against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927.  Vexatiously multiplying proceedings includes conduct where an attorney knows or reasonably should know that a claim pursued is frivolous or where an attorney "has engaged in some sort of conduct that, from an objective standpoint, falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996) (quotation marks and citations omitted).  Section 1927 "is designed as a sanction against dilatory litigation practices and is intended to require an attorney to satisfy personally the excess costs attributable to his misconduct."  *In re Ruben*, 825 F.2d 977, 983 (6th Cir. 1987); *see also Garner v. Cuyahoga Cnty. Juvenile Ct.*, 554 F.3d 624, 664 (6th Cir. 2009) (holding that the purpose of § 1927 is to "punish aggressive tactics that far exceed zealous advocacy").  Unlike other circuits, the Sixth Circuit does not require a showing of bad faith, but instead requires "something more than negligence or incompetence." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006).

Despite the Court's conclusion that Montell's claims are insufficient to proceed to trial, for the purposes of Rule 11 sanctions, her Complaint was not frivolous, either at the outset or after discovery progressed.  And there is no evidence that Montell or her counsel acted in bad faith or that their conduct was objectively unreasonable.  Additionally, in considering the defendants' 28 U.S.C. § 1927 claim, the plaintiff's attorneys did not vexatiously multiply these

proceedings by "aggressive tactics that far exceeded zealous advocacy." *Garner*, 554 F.3d at 664. Likewise, an award of sanctions to the plaintiff and her counsel for expenses and costs incurred from responding to the defendants' motion for sanctions is not warranted. In conclusion, sanctions would not be appropriate under the facts presented.

**V.**

For the reasons discussed above, it is hereby

**ORDERED** as follows:

1.      Defendants Diversified Clinical Services, Inc.'s and Austin Day's Motion for Summary Judgment [Record No. 36] is **GRANTED**.

2.      Defendants Diversified Clinical Services, Inc.'s and Austin Day's Motion for Sanctions [Record No. 43] is **DENIED**. Plaintiff Marla Montell's request for an award of costs and attorneys' fees incurred in responding the defendants' Motion for Sanctions [Record No. 45] is **DENIED.**

3.      Plaintiff Marla Montell's Motions In Limine [Record No. 35] are **DENIED**, as moot.

4.      The jury trial currently scheduled for **Tuesday, September 10, 2013**, is **CANCELED**.

5.      A separate Judgment will be entered this date in favor of the Defendants Diversified Clinical Services, Inc., and Austin Day.

This 26th day of August, 2013.



Signed By:

_**Danny C. Reeves**_   DCR

**United States District Judge**