RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0135p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

| | |
|---|---|
| MARLA MONTELL,<br>        *Plaintiff-Appellant/Cross-Appellee,*<br><br>    *v.*<br><br>DIVERSIFIED CLINICAL SERVICES, INC.; AUSTIN DAY,<br>        *Defendants-Appellees/Cross-Appellants.* | Nos. 13-6186/6231 |

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:12-cv-00036—Danny C. Reeves, District Judge.

Decided and Filed:  June 27, 2014

Before:  SUHRHEINRICH, MOORE, and WHITE, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:**  J. Dale Golden, Justin S. Peterson, GOLDEN & WALTERS, PLLC, Lexington, Kentucky, for Appellant/Cross-Appellee.  Katherine C. Weber, Sarah E. Keates, JACKSON LEWIS LLP, Cincinnati, Ohio, for Appellees/Cross-Appellants.

    MOORE, J., delivered the opinion of the court, in which SUHRHEINRICH and WHITE, JJ., joined.  SUHRHEINRICH, J. (pg. 17), delivered a separate concurring opinion.

---

**OPINION**

---

    KAREN NELSON MOORE, Circuit Judge.  Marla Montell reported an allegation of sexual harassment against her supervisor, Austin Day, to human resources ("HR") at Diversified Clinical Services, Inc. ("DCS").  The HR representative then contacted Day almost immediately.  The next day, Montell alleges, Day called Montell and told her that she should resign or else she

would be fired. On the following business day, Montell, feeling threatened and intimidated, resigned.

Montell appeals the district court's grant of summary judgment for DCS and Day in her suit against them alleging, under Kentucky law, harassment, intentional infliction of emotional distress ("IIED"),[1] retaliation, and negligent hiring, supervision, and retention. DCS and Day cross-appeal the district court's denial of their motion for sanctions against Montell under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. Because this case presents a classic genuine issue of material fact as to credibility—whether Montell's allegations or Day's denials are to be believed, we REVERSE the district court's grant of summary judgment as to the retaliation claim. In all other respects, we AFFIRM the district court's grant of summary judgment. We also AFFIRM the denial of the motion for sanctions.

## I. BACKGROUND

Marla Montell served as DCS's Program Director at the Frankfort Regional Medical Center ("FRMC"). Austin Day was the Area Vice President to whom Montell reported. R. 69-1 (Videotaped Dep. of Donald Austin Day ("Day Dep.") at 58) (Page ID #2408). In turn, Day reported to Senior Vice President Michael Tanner. *Id.* at 58–60 (Page ID #2408). DCS managed the wound care center at FRMC and derived revenue from: 1) a yearly consulting and management fee paid by FRMC; 2) revenue from hyperbaric oxygen treatments ("HBO treatments"); and 3) wound care revenue paid by patients. *Id.* at 45–46 (Page ID #2405); R. 68-1 (Videtaped Dep. of Michael Tanner ("Tanner Dep.") at 35–36) (Page ID ##2303–04).

**A. Montell's Performance**

As the Program Director, Montell managed the day-to-day activities of the wound care center, including supervising employees, performing community education, reporting charges to Medicare, overseeing the handling of reimbursements, and meeting with hospital representatives. R. 66-1 (Dep. of Marla Montell ("Montell Dep.") at 65–66, 72–74) (Page ID ##2018–19, 2025–

---

[1] It appears that Kentucky uses "IIED" and "outrage" as interchangeable names for one tort, *see Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004), as does Montell in this litigation. For simplicity, we will refer to her claim as one for IIED.

27); R. 69-1 (Day Dep. at 33–34, 47–55) (Page ID ##2402, 2400–07).  During her time, annual gross revenue of the wound care center increased.  R. 34-4 (Ex. 47) (Page ID #974).  On March 30, 2011, Montell received a 2% salary increase.  R. 34-6 (Ex. 51) (Page ID #1061).

Montell, however, also struggled with aspects of her job.  For example, the wound care center Montell managed failed to meet performance goals for the first three quarters of 2010.  At a management meeting, called a DASH meeting, in October 2010, Montell gave a presentation that was poorly received.  According to her supervisor, Day, Montell's presentation showed a "[c]omplete lack of understanding of what was driving the business, what was behind it, and the root cause of her issues or problems and how to solve them."  R. 69-1 (Day Dep. at 84–85) (Page ID ##2414–15).  Others, including Montell, agreed that her presentation did not go well.  R. 66-1 (Montell Dep. at 85) (Page ID #2039); R. 63-1 (Videotaped Dep. of Belinda Blair ("Blair Dep.") at 31) (Page ID #1763); R. 68-1 (Tanner Dep. at 24) (Page ID #2292).  Day placed Montell on a Performance Improvement Plan ("PIP") on November 9, 2010, that identified knowledge deficits, particularly related to processing Medicare/Medicaid reimbursements for FRMC and analyzing data contained in DCS's operational reports.  R. 34-3 (Ex. 13) (Page ID #830).

Montell also failed to meet revenue goals, including in the fourth quarter of 2010.  R. 69-1 (Day Dep. at 195) (Page ID #2148).  Moreover, despite the PIP, Montell continued to have trouble with the coding for Medicare reimbursement.  *Id.* at 119–27 (Page ID ##2072–80).  As a result, Montell received a documented oral counseling and a development plan in March 2011, which focused on the reimbursement issues.  R. 34-3 (Exs. 18, 19) (Page ID ##848–54).

On April 13, 2011, DCS issued Montell a Final Warning, which communicated expectations of Montell, noted a decline in the number of new patients, wound care center treatments, and HBO treatments, and expressed the expectation that the facility should generate increases in new patients (3%), wound care treatments (5%), and HBO treatments (10%).  R. 34-4 (Ex. 28) (Page ID ##882–83).  Failure, according to the Final Warning, could result in termination.  *Id.*  This Final Warning was amended on May 3, 2011, because of another FRMC complaint regarding the handling of reimbursements.  R. 34-4 (Ex. 29) (Page ID ##886–90).  Rather than receive termination, Montell was given additional time to show improvement.  R. 69-1 (Day Dep. at 202) (Page ID #2444); R. 68-1 (Tanner Dep. at 83–84) (Page ID ##2351–52);

No. 13-6186         *Montell v. Diversified Clinical Servs. et al.*                    Page 4

R. 64-1 (Videotaped Dep. of Megan Lee ("Lee Dep.") at 30–31) (Page ID ##1837–38). Pat Wolfe, manager of Medical Billing and Physician Services at DCS, provided additional training to Montell on the reimbursement issues on May 2, 2011; at which point Wolfe stated to Day, "I am comfortable with [Montell]'s knowledge of the concepts." R. 34-6 (Ex. 52) (Page ID #1062). The Amended Final Warning also noted that the metrics were not met for the month of April. R. 34-4 (Ex. 29) (Page ID #888). Finally, this Amended Final Warning issued on May 3 stated that "[f]rom this point forward, [Montell] is operating on a 30 day action plan. If any of the requirements stated above or the requirements previously stated in the Final Warning and the 6 month action plan are not met, termination will be the next step." *Id.* There were no complaints regarding Montell's performance between May 3, 2011, and May 23, 2011. On Thursday, May 19, 2011, Day notified Montell that she had not met her performance bonus goals for the first quarter of 2011. R. 66-1 (Montell Dep. at 195–97) (Page ID ##2148–50); R. 34-4 (Ex. 31) (Page ID ##893–94).

**B. Montell's Experience**

Montell testified that throughout her time working for Day, he would comment on her appearance at every opportunity. While she first took these comments as compliments, R. 66-1 (Montell Dep. at 148) (Page ID #2101), Day became more aggressive with the comments. For example, Day stated, "[n]othing turns me on more than a woman in a red dress and heels," while Montell was wearing a red dress and heels. *Id.* at 146 (Page ID #2099). He would often preface the comments about his sexual arousal with "[d]on't call HR on me," or "you can get me in trouble." *Id.* According to Montell, these increasingly aggressive comments scared her. *Id.* at 149–50) (Page ID ##2102–03). She would attempt to avoid Day's presence when he would come to the facility. *See id.* at 147 (Page ID #2100). At one point Montell even began to cry, in front of Day, after he said that when people first meet Montell they think she is an air head while drawing an hourglass shape with his hands. *Id.* at 138 (Page ID #2091).

No. 13-6186   *Montell v. Diversified Clinical Servs. et al.*   Page 5

Montell first complained about Day's sexual harassment to another Program Director, Belinda Blair. R. 63-1 (Blair Dep. at 35) (Page ID #1767). Blair alerted Day that Montell accused him of sexual harassment. R. 34-4 (Ex. 35) (Page ID #901).[2]

According to Montell's deposition testimony, on Thursday, May 19, 2011, Montell called Megan Lee, an HR representative, to report Day's sexual harassment of her. R. 66-1 (Montell Dep. at 145) (Page ID #2098). Montell reported the alleged sexual harassment after Blair encouraged Montell to make a report. *Id.* at 145, 161–63 (Page ID ##2098, 2114–16); R. 63-1 (Blair Dep. at 35) (Page ID #1767). Lee notified Day of the sexual harassment complaint almost immediately. R. 64-1 (Lee Dep. at 45–46) (Page ID ##1852–53). On the following day, according to Montell, Day called her and told her to resign or else he would fire her. R. 66-1 (Montell Dep. at 162) (Page ID #2115). Moreover, Day called the hospital liaison at FRMC and stated that Montell had resigned on Friday, May 20, 2011. *Id.* The liaison asked Montell whether she had indeed resigned as Day reported, and Montell denied resigning. *Id.* at 162, 218 (Page ID ##2115, 2171. Montell then again called Lee to report Day and request a reprimand because Day had retaliated against her for making her report of sexual harassment. *Id.* at 162, 217–218 (Page ID ##2115, 2170–71). Feeling threatened, Montell resigned on Monday, May 23, 2011. *Id.* at 162 (Page ID #2115).

C. **Post-Termination and Discovery Evidence**

Lee investigated Montell's claims by interviewing Day and Blair. R. 64-1 (Lee Dep. at 52–53) (Page ID ##1859–60). Day denied that he had made the comments, and Blair confirmed that Montell had made the same accusations after the October 2010 DASH presentation. R. 34-4 (Ex. 35) (Page ID #901). Lee decided that the accusations against Day did not warrant any further action. R. 64-1 (Lee Dep. at 52–53, 64, 67) (Page ID ##1859–60, 1871, 1874).

---

[2] In her appellate brief, Montell asserts that it was at this point that Day "began a mission to either fire Montell or force her resignation." Appellant Br. at 6–7. For example, Montell points out that Day asked Patience McLaughlin, an employee under the supervision and management of Montell, to send weekly emails secretly reporting when Montell arrived at FRMC. R. 34-5 (Ex. 49 at 11–13) (Page ID ##1044–46). Montell, however, has failed to present a complete argument that Blair's sharing of Montell's grievance was protected conduct and an impetus for retaliation, thus forfeiting any argument that Day's increased scrutiny of her was retaliatory. She also failed to make this argument below. Instead she has argued that the protected activity which motivated retaliation against her was her May 19, 2011, complaint to HR.

During his deposition, Day testified that before Montell's resignation he had no plans to fire Montell even though the amended final warning document stated that the next step would be termination. R. 69-1 (Day Dep. at 161–62, 203–04) (Page ID ##2434, 2444). Similarly, Lee stated that DCS had no plan to terminate Montell. R. 64-1 (Lee Dep. at 68) (Page ID #1875). According to Day, the warnings were intended to motivate Montell. R. 69-1 (Day Dep. at 161–62, 203–04) (Page ID ##2434, 2444). Montell stated that she viewed the goals on the warning sheets as motivation. R. 66-1 (Montell Dep. at 171–73, 192–93) (Page ID ##2124–26, 2145–46). And Montell never told Day that she was planning to resign. R. 69-1 (Day Dep. at 229) (Page ID #2451).

## D. Procedural Posture

Montell filed suit on May 2, 2012, in Kentucky state court. The defendants removed the suit to federal court on diversity of citizenship grounds, 28 U.S.C. § 1332, on May 29, 2012. R.1 (Notice of Removal) (Page ID ##1–6). The district court granted summary judgment on August 26, 2013. R. 60 (Memorandum Opinion and Order) (Page ID ##1695–1727). This appeal, for which we have jurisdiction pursuant to 28 U.S.C. § 1291, timely followed.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment de novo." *Hamilton v. General Elec. Co.*, 556 F.3d 428, 433 (6th Cir. 2009). When the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact, summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c). In reviewing a motion for summary judgment, we must and do view all facts and inferences in the light most favorable to the non-moving party—in this case, Montell. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Moreover, "although [we] should review the record as a whole, [we] must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). After all, as the Supreme Court has repeatedly instructed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

No. 13-6186        *Montell v. Diversified Clinical Servs. et al.*        Page 7

functions, not those of a judge." *Id.* at 150 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (internal quotation marks omitted).

**B. Montell's Claims**

    **1. Retaliation**

Montell's main claim is that she was constructively discharged by DCS in retaliation for complaining about Day's sexual harassment in violation of the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. § 344.280. Under the KCRA, it is unlawful "[t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." Ky. Rev. Stat. § 344.280(1). Retaliation claims under the KCRA are evaluated under the same standard as we use to evaluate federal Title VII claims. *See Hamilton*, 556 F.3d at 435; *see also Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 801–02 (Ky. 2004).

Because Montell attempts to prove retaliation by using circumstantial evidence, her claims are evaluated using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973). Under that framework, Montell must show that she (1) engaged in a protected activity, (2) that DCS knew of her protected conduct, (3) that DCS took an adverse employment action against her after her protected conduct, and (4) that there was a causal connection between the exercise of Montell's protected right and the adverse employment action taken by DCS. *See Hamilton*, 556 F.3d at 435. If Montell makes out this prima facie case, the burden shifts to DCS to produce a legitimate, non-retaliatory reason for its action. *See id.* Assuming that DCS is able to produce such an explanation, the burden shifts back to Montell to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual. *See id.*

This burden-shifting framework presents the risk that litigants and courts will fail to distinguish between the plaintiff's intermediate and ultimate burdens. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

No. 13-6186          *Montell v. Diversified Clinical Servs. et al.*          Page 8

253 (1981). This burden-shifting framework and its intermediate burdens are intended "to bring the litigants and the court expeditiously and fairly to this ultimate question." *Id.* Ultimately, Montell will have to "establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).[3]

### a. Protected Activity

DCS contends that Montell's complaint to HR should not be considered a protected activity because Montell could not have believed that Day's few comments could constitute illegal sexual harassment. Appellee Br. at 22 n.6. This argument can be quickly dispatched. The comments that Day made to Montell—regarding being turned on by a woman in a red dress and heels, while Montell was wearing a red dress and heels—were sexual in nature. As a supervisor, Day directed the comments to an employee reporting to him. Moreover, according to Montell, Day prefaced the comments by acknowledging that she could get him in trouble with HR for making the comments. When Montell reported the comments, Lee did not respond that such comments clearly did not constitute sexual harassment. Instead, Lee investigated to determine whether such comments were actually made. Thus, when all facts must be viewed in the light most favorable to Montell and all reasonable inferences must be made in her favor, we conclude that Montell could have had a good-faith, reasonable belief that she was reporting unlawful sexual harassment. Whether she actually held such a belief, a question of credibility, must be left to a jury. Thus, we conclude that Montell has satisfied the first element of the prima facie case.

---

[3]It is not clear whether Kentucky law not only has adopted past federal interpretations of Title VII, but also automatically adopts all future changes to that law, like *Nassar*, for purposes of interpreting the KCRA. However, language from *Brooks* suggests that Kentucky would adopt not only then-existing federal law, but federal law as it continues to evolve. *See Brooks*, 132 S.W.3d at 801–02 (discussing reasons for adopting federal law for interpreting the KCRA retaliation provisions).

### b. Causation

While DCS does not dispute that it was aware of Montell's protected conduct and that it took an adverse employment action against her after her protected conduct,[4] DCS vigorously disputes that there was a causal connection between the exercise of Montell's protected right and the adverse employment action taken by DCS. Appellee Br. at 22–27. The main thrust of DCS's argument is that Montell's sole evidence of the causal connection was the temporal proximity between her sexual harassment report and constructive discharge. DCS argues that "[t]emporal proximity, standing alone is insufficient to state a *prima facie* case of causation." *Id.* at 22 (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010)). Furthermore, DCS contends that Montell's termination was previously contemplated. Consequently, DCS argues that the temporal proximity of her complaint and her termination cannot establish the causal connection. *Id.* at 22–23 (citing *University of Louisville Ath. Ass'n, Inc. v. Banker*, No. 2011-CA-001436-MR (Ky. Ct. App. Feb. 1, 2013)).

In making the argument that Montell cannot establish causation because temporal proximity alone is not enough, DCS misconstrues both the facts and the law. On the law, we have held that temporal proximity alone can be enough:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (reconciling two lines of cases, some of which say that temporal proximity alone is not enough, and some that say temporal proximity alone can be enough, and explaining why the two strands diverged, *id.* at

---

[4]In the district court, DCS did contend that Montell was not constructively discharged. *See* R. 36-1 (Mot. for Summ. J. at 21) (Page ID #1187). It has not presented this argument to this panel. It is, therefore, waived. *See Jones v. Bagley*, 696 F.3d 475, 488 n.7 (6th Cir. 2012) (noting that known arguments not advanced in appellate briefs are waived).

523–25).[5]   Moreover, cases that state temporal proximity alone is not enough to establish causation also note that combining temporal proximity with other evidence of retaliatory conduct is enough to establish a causal connection.  *See, e.g.*, *Spengler*, 615 F.3d at 494 (noting that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim," but elaborating that "there are circumstances in which temporal proximity, when combined with other evidence of retaliatory conduct, is enough to establish a causal connection"); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (noting that "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim," but elaborating further that "[t]here are, however, circumstances where temporal proximity, considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection").  DCS gives short shrift to other evidence proffered by Montell.

Montell's allegation is that her protected activity occurred on Thursday, May 19, 2011, and that the very next day, Day presented her with an ultimatum that she should resign or else he would fire her.  Certainly, through her own deposition testimony, Montell has presented enough evidence that, were the jury to believe her story, they could make the reasonable inference that the adverse employment action is so close in time after an employer learns of a protected activity that the action was caused by that activity.  *See Mickey*, 516 F.3d at 525.  Moreover, Montell does not rely on temporal proximity alone.  While it is nearly impossible to come up with other evidence that the adverse employment action was retaliatory where the adverse action comes directly on the heels of the protected activity, *see id.* (pointing out that "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation

---

[5]It appears that the Supreme Court has accepted that "very close" temporal proximity may be enough to establish an inference of a causal connection.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (acknowledging without criticizing that circuit court cases "that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"); *see also Mickey*, 516 F.3d 524–25 (noting that *Breeden* could be read to accept that temporal proximity may be sufficient in some cases).  Moreover, as we are interpreting Kentucky law, we note that the Kentucky Supreme Court has interpreted our cases and *Breeden* to stand for the proposition that "where there is no direct evidence of a causal connection" it is enough "[i]n most cases" to prove that "(1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action."  *Brooks*, 132 S.W.3d at 804.  Certainly, Montell has presented sufficient evidence as to the employer's awareness of the protected activity, and, without a doubt, the temporal relationship between the protected activity and the adverse action is sufficiently close.

because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation"), Montell does point to two acts by Day that could be construed as evidence that her discharge was retaliatory. First, Day, soon after finding out that Montell had lodged a sexual harassment complaint against him, called Montell and told her to resign or that she would be fired. Second, Day called the FRMC liaison with whom Montell worked and told the liaison that Montell had resigned before Montell had done so, thus undermining Montell's ability to remain on the job. Montell has presented sufficient evidence of this alleged conduct from which a jury certainly could conclude that the temporal proximity of the adverse action to the sexual harassment report and the efforts taken by Day to undermine Montell at her worksite and force her to resign establish that Day was retaliating against Montell for her sexual harassment report.

While DCS leads with the argument that Montell has nothing but temporal proximity to establish causation and that temporal proximity alone is not enough, DCS's contention goes beyond simply maintaining that Montell has not presented enough evidence of causation. DCS also claims that because the adverse employment action—Montell's discharge—was contemplated before Montell's protected activity, "[a] causal connection cannot be established by temporal proximity." Appellee Br. at 22. In essence, DCS is asking us to discount Montell's reliance on temporal proximity, *see id.* at 24 (stating that "Montell cannot rely on temporal proximity"), or to raise the evidentiary standard for the causation determination to survive summary judgment, *see id.* at 21 (citing *Nassar*'s "but-for cause" standard when discussing the causation element of the prima facie case).

The Supreme Court has expressed a concern that employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated. *See Nassar*, 133 S.Ct. at 2532 ("[A]n employee who knows that he or she is about to be fired for poor performance, . . . . [t]o forestall that lawful action, . . . might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation."); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("Employers need not suspend

previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). We similarly acknowledge that employees who are about to be fired should not abuse the civil-rights protections by filing frivolous harassment complaints. However, it cannot be open season for supervisors to sexually harass poorly performing employees. Such employees must still be provided with their legal protections.

To balance these competing interests, we faithfully follow the Supreme Court's instructions from *Breeden*. When the employer "proceed[s] along lines previously contemplated," we must not take the temporal proximity of the adverse employment action as evidence of causality. *Breeden*, 532 U.S. at 272. Thus, we recognize that "[an employer] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality," *id.*, but where an employer deviates from those lines, temporal proximity can certainly be evidence of causality. Such a reading of *Breeden* comports with our previous observation that in retaliation cases, courts must determine "what made [the employer] fire [the employee] *when it did*." *Hamilton*, 556 F.3d at 436 (emphasis added). Thus, we must analyze the evidence of how and when the adverse employment action occurred to determine whether it squares with the action previously contemplated. If it does, then temporal proximity is not evidence of causality, but if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation.

DCS had taken significant time to develop a written record of Montell's poor performance. Steps taken to document the poor performance include a PIP, documented oral counseling and development plan, a Final Warning, and an Amended Final Warning. These steps were taken not just by Day alone, but in consultation with his supervisor, Tanner, and with Lee from HR. The record makes clear that before each step was taken, there was discussion and consultation, and a record was created with each step. The Amended Final Warning, issued on May 3, 2011, stated that Montell was "operating on a 30 day action plan. If any of the requirements stated above or the requirements previously stated in the Final Warning and the 6 month action plan are not met, termination will be the next step." R. 34-4 (Ex. 29) (Page ID

#888).  This language makes fairly clear that Montell had until June 2, 2011, to improve or else face termination.  Yet, according to Montell's deposition testimony, Day called her on May 20, 2011, one day after she filed her sexual harassment complaint, and told her that she would be fired if she did not resign.  Moreover, while Day had previously requested permission to terminate Montell—the decisionmakers later decided to issue an Amended Final Warning instead—this time he simply called Montell and told her to resign or she would be fired.  Furthermore, according to Montell's deposition testimony, Day called the hospital liaison and told her that Montell had resigned.  These actions on May 20, 2011, simply do not accord with either the timing of the termination previously contemplated or with the manner in which that decision was being made.  Instead, the actions appear to be evidence of retaliation by Day against Montell for filing a sexual harassment complaint against him.  Thus, despite the previous contemplation of Montell's discharge, the nature of the actions taken and their timing suggest that the proximity of Montell's discharge to her protected activity can be used as evidence of a causal connection.  Because of the temporal proximity and other evidence of a causal connection, we conclude that Montell has successfully presented a prima facie case of retaliation.

### c. Pretext

Having concluded that Montell has presented a prima facie case of retaliation, we turn to the next steps of the burden-shifting analysis.  DCS claims that the adverse employment action taken against Montell was the result of her poor performance.  Montell does not challenge this as a non-retaliatory, legitimate reason, but argues that it is pretextual.  Thus, we are left to determine whether Montell has "demonstrate[d] that the proffered reason was not the true reason for the employment decision."  *Burdine*, 450 U.S. at 256.  While there are at least three ways to show pretext, *see Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012), Montell attempts to prove that the proffered reason—documented poor performance—while factually true was not sufficient to motivate discharge.  Appellant Br. at 38–41.  In analyzing whether the stated reason is merely pretextual, we bear in mind that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?"  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).  "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.  If

so, her prima facie case is sufficient to support an inference of discrimination at trial." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

DCS's claim that Montell would have been fired in any event for poor performance is supported by the documentation of her poor performance including the PIP, the documented oral counseling and development plan, the Final Warning, and the Amended Final Warning. The Final Warning and Amended Final Warning, in particular, noted that termination would be the next step if Montell failed to improve. However, contradictory evidence in the record undermines the conclusion that termination was inevitable. In their deposition testimony, Day and Lee both state that no decision had been made to terminate Montell and that the warnings were intended to motivate Montell to do better. If, as Day testified, no decision had been made whether to fire Montell, then why did Day, as Montell testified at her deposition, call Montell and tell her that she should either resign or she would be fired? Why did Day tell the hospital liaison that Montell resigned before she had actually done so? Day has denied making either call. The credibility findings and the determination whether these calls actually occurred are questions of fact on which there is conflicting evidence in the record. This constitutes a genuine issue of material fact and, consequently, must be resolved by a jury, not at summary judgment.

Moreover, as we noted earlier, we must determine what made DCS constructively discharge Montell *when it did*. *See Hamilton*, 556 F.3d at 436. DCS can point to no evidence or suggest any failure by Montell that would have led to her termination when it occurred. After all, the Amended Final Warning was issued on May 3, 2011, and stated that Montell was on a thirty-day action plan. Furthermore, it stated that failure to achieve the improved performance would lead to termination. However, there were no complaints regarding Montell's performance between May 3, 2011, and May 23, 2011. Montell had not even had a complete chance to achieve the requirements as stated in the Final Warning, the Amended Final Warning, and the six-month action plan. Thus, at the time of the discharge, Montell had not failed in a way that subjected her to termination.[6]

---

[6]DCS points to the May 19, 2011, notification that Montell had not met her performance bonus goals for the first quarter of 2011, but this notification sheds no light on the issue in question—whether Montell's constructive discharge was truly a result of poor performance. The first quarter bonus goal was not one of the stated required improvements in the Final Warning and Amended Final Warning, which were issued to Montell after the conclusion of the first quarter.

Simply put, two pieces of evidence undermine the suggestion that Montell's termination was the result of poor performance. First, the decisionmakers testified in their depositions that they had not yet decided to terminate Montell. Second, Montell's testimony that Day called her and the hospital liaison in order to force her resignation suggests that the real reason for her termination was not poor performance—after all, the decisionmakers had not yet decided to terminate her—but rather retaliation for Montell's sexual harassment complaint against Day. Because a reasonable jury could conclude that Montell's poor performance was not sufficient to motivate Day's calls—i.e., that the stated reason for Montell's discharge is merely pretext—and instead, that Day's calls causing Montell's constructive discharge were in fact retaliatory, Montell has met her ultimate burden to withstand summary judgment. The motion for summary judgment on the retaliation claim should have been denied. We REVERSE the district court's grant of the motion for summary judgment.

**2. Non-Retaliation Claims**

We can make short work of Montell's remaining claims. First, Montell's remaining claim against DCS—negligent hiring, supervision, and retention—fails because it lacks any factual support in the record. Despite this observation by the district court, R. 60 (Memorandum Opinion and Order at 29) (Page ID #1723), on appeal Montell does not point to any evidence in the record that supports a finding of negligent hiring, supervision, or retention. Consequently, we AFFIRM the grant of summary judgment on that claim.

Second, Montell's claim that Day harassed her in violation of Kentucky Revised Statutes § 525.070 fails because she provides no evidence that Day's comments were made "with intent to intimidate, harass, annoy, or alarm" her. Ky. Rev. Stat. § 525.070(1). Once again, despite the district court opinion stating that "the record is devoid of any additional evidence that Day acted with the intent necessary for a viable claim of harassment," R. 60 (Memorandum Opinion and Order at 15) (Page ID #1709), Montell does not point to any evidence in the record from which a jury could conclude that Day had the requisite intent. Consequently, we AFFIRM the grant of summary judgment on Montell's harassment claim against Day.

Third, Montell's IIED claim against Day fails because under Kentucky law, for Day to be liable, his conduct must be "*so outrageous in character, and so extreme in degree, as to go*

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (quoting *Restatement (Second) of Torts*, § 46 Comment d). While the comments that Montell alleges Day made were offensive to her, they simply do not rise, as a matter of law, to this high standard. Consequently, we AFFIRM the grant of summary judgment on the IIED claim.

### C. Motion for Sanctions

Finally, DCS has moved for sanctions against Montell. The district court denied the motion for sanctions, R. 60 (Memorandum Opinion and Order at 33) (Page ID #1727), and we review for an abuse of discretion, *Tropf v. Fidelity Nat'l Title Ins. Co.*, 289 F.3d 929, 936 (6th Cir. 2002).

Rule 11 sanctions may be awarded only if Montell's conduct in the litigation was objectively unreasonable, *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002), or if Montell did not have a reasonable basis for making her claim, *see Tropf*, 289 F.3d at 939. Under 28 U.S.C. § 1927, sanctions may be imposed against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously."

In this case, Montell's conduct during litigation has not been objectively unreasonable, her claims have not been frivolous but rather based on a reasonable basis, and her attorneys did not unreasonably and vexatiously multiply the proceedings. Sanctions are not warranted. Consequently, we AFFIRM the denial of sanctions by the district court.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment as to the retaliation claim. In all other respects, we AFFIRM the district court's grant of summary judgment. We also AFFIRM the denial of the motion for sanctions. We REMAND the case for further proceedings consistent with this opinion.

---

# CONCURRENCE

---

SUHRHEINRICH, Circuit Judge, concurring:  I concur with the majority, but write separately to emphasize a key fact:  the timing of Montell's sexual harassment complaint, which occurred the same day that Day informed her that she had not met her performance goals,[1] and two weeks after the Amended Final Warning.  As the majority notes, "[t]he Supreme Court has expressed a concern that employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated."  *See also University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2532 (2013).

There is a genuine question in this case whether Montell's sexual harassment complaint—her first and only sexual harassment claim in the eighteen-month period of her employment with DCS—was done to insulate herself from potential termination that she was fully aware of.

---

[1] In her deposition, Montell admitted that she made the call to Lee after Day's email informing her that she had not met her performance goals.  ID# 2152-53.